HOUSTON B. & T. RY. CO. v. HORNBERGER.

(Court of Civil Appeals of Texas. Galveston. Dec. 13, 1911. On Motion for Rehearing, Jan. 18, 1912.)

1. EMINENT DOMAIN (§ 10*) — LEGISLATIVE POWER—TERMINAL RAILROAD COMPANY.

The Legislature could not give terminal railroad companies the right of eminent domain, unless their operation constitutes a public use.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 10.*]

2. EMINENT DOMAIN (§ 10*)—POWER TO EXERCISE RIGHT — TERMINAL RAILROADS — "PUBLIC USE."

Under Const. art. 1, § 17, prohibiting grant of irrevocable and uncontrollable franchises, incorporation of a terminal railroad company under Act May 9, 1905 (Acts 29th Leg. c. 109) did not constitute a contract which could not be modified by subsequent legislation, as affecting the company's right to accept and rely on the subsequent amendment of the act in 1907 (Acts 30th Leg. c. 157), by acting under the amendment, so as to make the operation of the road a public use, entitling the company to exercise the right of eminent domain as a common carrier, within Const. art. 10, §§ 1, 2.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 10.*]

3. EMINENT DOMAIN (§ 55*)—POWER TO EXERCISE RIGHT—TERMINAL RAILROADS.

That the charter of a terminal railroad company, organized under Act May 9, 1905 (Acts 29th Leg. c. 109), restricts the length of its main line to about 20 miles, following a route described in general terms, does not prevent it from condemning land lying more than 20 miles from the specified place of beginning, if the road is being constructed in the reverse direction from the calls in the charter, and such land lies within the 20-mile limit under such construction.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 55.*]

4. RAILROADS (§ 18*) — TERMINAL ROADS — CHARTERS—PURPOSE OF ORGANIZATION.

That a corporation adopted the name "Houston Belt & Terminal Railway Company," and its charter provides for a route forming a complete "belt" line around the principal part of the city, does not contradict a purpose, plainly declared in the charter, to form a terminal company under Rev. St. 1895, art. 642, subd. 53, as distinguished from a suburban belt line provided for by subdivision 21.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 18.*]

Appeal from Harris County Court; Clark C. Wren, Judge.

Condemnation proceeding by Houston Belt & Terminal Railway Company, against Jacob Hornberger. From the judgment, plaintiff appeals, and defendant cross-appeals. Reversed and rendered on direct appeal; affirmed on cross-appeal.

Andrews, Ball & Streetman and A. L. Jackson, for appellant. Campbell, Sewall & Myer and Ross & Wood, for appellee.

McMEANS, J. Appellant, Houston Belt & Terminal Railway Company, as plaintiff below, on the 20th day of June, 1910, presented to the county judge of Harris county, Tex., its written petition and statement against Jacob Hornberger, as defendant below, setting forth the necessary facts required by the statutes in such cases, seeking to condemn as right of way for its railroad a strip of land 50 feet wide, containing 1.65 acres of land, belonging to defendant, being part of a 75-acre tract of acreage property belonging to said Hornberger, near Houston, located on Buffalo bayou, alleging that plaintiff and defendant had been unable to agree upon the value of the property to be taken, or the damages to the remainder of said tract, and praying that the judge appoint special commissioners, as provided by law, to hear the evidence, assess and award damages, etc. Upon said petition, the county judge indorsed his order on June 20, 1910, appointing three disinterested freeholders of Harris county as special commissioners to assess the damages incident to the taking of the land for the purpose stated in said petition, as provided by law. Thereupon the commissioners so appointed caused notice of hearing to be duly issued and served upon the defendant, Jacob Hornberger, who there-

upon, in due time, filed his answer. After full hearing, the commissioners rendered their decision, July 2, 1910, awarding the defendant, Jacob Hornberger, as the value of the strip of land taken, and damages to the remainder of said land, the sum of $1,600, and adjudged the costs against the plaintiff. Defendant, Hornberger, thereupon announced his objections to the findings and award of the commissioners, and filed his formal objections thereto. After the award of the commissioners, the plaintiff made formal tender to the defendant of the amount so awarded, together with costs, as provided by law, which tender was refused, and, defendant's counsel having announced his objections to the award, the plaintiff duly deposited in the registry of the county court with the clerk thereof, as provided by law in such cases, the sum of $3,200, and paid to the clerk the proper amount to cover the costs of said proceeding, and also filed and deposited with the said clerk a bond, as provided by law, in the sum of $500, for the security of the further costs that might be awarded, and thus complied with the law which provides for taking possession of land in such cases, pending further proceedings.

The proceedings having been removed by defendant, for trial, into the county court, plaintiff, in response to exceptions of defendant, filed its first amended original petition, on which the subsequent trial and other proceedings were had, alleging, in substance, the following facts: That plaintiff was a terminal railway company, duly chartered under and by virtue of the act of the Texas Legislature, known as chapter 109 of the General Laws of 1905, entitled, "An act to amend section 53, article 642, chapter 2, title 21, of the Revised Statutes of the state of Texas," and that plaintiff also was entitled to all the rights, powers, privileges, and immunities created and existing under and by virtue of an act passed by the Thirtieth Legislature (Acts 30th Leg. c. 157) of the state of Texas, and known as "An act to amend section 53, article 642, chapter 2, title 21, of the Revised Statutes of the state of Texas, as amended by chapter 109 of the General Laws of Texas, 1905," and had the right of eminent domain; that plaintiff, under and in accordance with its charter powers and duties, had acquired and constructed and owned a track of railroad, extending between the railroads of the Trinity & Brazos Valley Railway Company and the Beaumont, Sour Lake & Western Railway Company, situated to the north and northeast of the city of Houston, said track being approximately 4.77 miles in length, and, at the point known as "Belt Junction," plaintiff, in the performance of its functions, had established a railroad yard, with trackage facilities, and from such point had constructed and owned a track extending through and upon certain streets of the city of Houston, with the consent of said city, and passing by its certain

freight and passenger stations or depots near the center of said city of Houston, thence extending to a point south of the city of Houston, at which it intersected the main line of the Gulf, Colorado & Santa Fé Railway, at what was known as the "south yards," at which point the plaintiff also had for its corporate purposes certain sidings and other tracks constituting what was known as the "south yard"; that plaintiff, acting under its corporate powers, had made and entered into contracts with four certain railroad companies which operated trunk lines of large and extensive mileage into and terminating at the city of Houston, to wit, the Gulf, Colorado & Santa Fé Railway Company, the Trinity & Brazos Valley Railway Company, the St. Louis, Brownsville & Mexico Railway Company, and the Beaumont, Sour Lake & Western Railway Company; that the said railway companies having and controlling large business as common carriers of passengers and freight destined to and away from Houston, as a terminus and transfer point, and having no adequate terminal tracks or facilities at Houston for the proper transfer and handling, and other terminal service at said point, the plaintiff, under contract, has undertaken to perform all such terminal service for said companies, which consisted in taking charge of the trains and cars of freight reaching plaintiff's south yard from the Gulf, Colorado & Santa Fé Railway Company and the St. Louis, Brownsville & Mexico Railway Company, and reaching the yard at Belt Junction, northeast of Houston, from the Beaumont, Sour Lake & Western Railway Company and the Trinity & Brazos Valley Railway Company, and in making up trains and transferring cars of freight back and forth between the said companies, according to the destination and routing thereof, and in furnishing trackage and other facilities to the passenger trains of said companies, and for the mutual exchange and handling of business among them; that the result of such contract and arrangement was mutually advantageous, expeditious, and economical, both to the said railway companies, as common carriers, and to the traveling and shipping public; that, in order to facilitate and expedite the handling of such business on behalf of the said railroad companies, the defendant, with the consent and authority of the city of Houston, has acquired properties in and near the center of said city, and has established thereon certain freight stations and depots and its passenger depot, serving the purpose of a Union Depot for the said four railroad companies and others that may desire to arrange for the use thereof, which said freight and passenger depots have been and are maintained by plaintiff under its charter powers and franchises as regular stations and depots for the receipt and delivery of freight and passengers; that heretofore all of the freight and passenger business handled by plaintiff

for the said railroad companies has been transported between said Belt Junction and the south yard over the said railroad constructed between said points, extending through and across certain streets in the city of Houston; that, on account of constantly having to stop in passing over and across streets in said city, and in crossing over the tracks of other railroads, it is difficult and burdensome for plaintiff to handle its said traffic, and that as a result thereof the traffic frequently becomes congested, and complaints are constantly made by the traveling public of the obstruction of streets thereby, all of which causes, together with the increase in freight traffic of the said railroad companies, will increase the difficulty and obstacles in handling said freight and passenger business, and transferring the same by means of the said tracks heretofore constructed and used through the streets of said city, and along and by its said freight and passenger depots, as aforesaid, and for the purpose of expedition, and in the interest of economy, and in order that the plaintiff may more efficiently and effectively conduct and transact its business in the handling and transferring of freight traffic, and in the interest of the public, it has projected and determined upon constructing and operating a new and additional line from the intersection with the railroad of the Beaumont, Sour Lake & Western Railroad Company, at the northeast of Houston, in a southerly direction, beyond the limits of the city of Houston, crossing Buffalo bayou near the turning basin of the Houston ship channel, and extending through the property of the defendant, Hornberger, and terminating at the plaintiff's south yard; that said new line will have a mileage of approximately 9.77 miles; that it is the purpose of plaintiff to use this new line principally in the handling, transfer, and delivery of freight traffic delivered to and received by it as a terminal railroad company, so that it may more expeditiously and economically handle said freight traffic, and relieve the said traffic extending through the city of Houston, and by the said freight and passenger depots, of the congested condition heretofore and now existing.

In order to meet some exceptions of the defendant, the amended petition also makes further allegations in detail with regard to the public purposes and necessity for taking said property, as to the value of the land sought to be condemned, the damage to the remainder thereof, and the failure of the parties to agree upon such damage. A copy of plaintiff's charter is attached to the amended petition as an exhibit.

The defendant's first amended original answer, on which the cause went to trial, contained a general demurrer and several special demurrers, involving the constitutionality of the act of 1905, the validity of the charter under said act, and various other points with regard to the sufficiency of plaintiff's pleading.

The answer also contains substantially the following pleas: (1) A denial, verified by affidavit, that the plaintiff had the corporate capacity to sue. (2) Denial that plaintiff, in good faith, was seeking the right of way for terminal or public purposes, but the real purpose was to give the four railroad companies mentioned a monopoly. (3) That plaintiff had no power to condemn, for the reason that the act of 1905, under which it was originated, was unconstitutional in giving power to condemn without making terminal companies common carriers, and that the act imposed no duty on plaintiff to serve the general public, and did not impose the duties and restrictions resting on ordinary railroad companies. (4) That plaintiff's charter was void, because it authorized two distinct and independent lines of business, to wit, that of a terminal company and a suburban belt railway company. (5) That the plaintiff, prior to this proceeding, had already exhausted its authority by taking for its trackage 20 miles before reaching defendant's property. (6) That the purpose for which plaintiff sought to take the right of way was not public not necessary. (7) That the award of the commissioners was not sufficient, and that the value of the strip of land actually taken, and the damage to the remainder, would amount to $57,500, for which defendant prayed judgment, if the property should be condemned.

The trial judge, in passing on the demurrers contained in defendant's answer, prepared and filed in writing his views thereon, and, while he overruled all of them, he indicated that, in his opinion, the special demurrers embraced in the twelfth, thirteenth, fourteenth, fifteenth, and sixteenth paragraphs of the answer, to the effect that the amended act of 1905, authorizing the condemnation proceedings, was unconstitutional, were well taken, and should be sustained; however, the court announced, in that connection, that, believing it better to try the whole case on its merits, and make a complete record, he would overrule these demurrers, also, pro forma, which he accordingly did, and proceeded to trial before a jury.

After the evidence had been then closed, the judge, at the instance of defendant, submitted the cause to the jury on special issues presented and requested by said defendant, and, the jury having returned their special verdict and findings, the court entered judgment thereon April 3, 1911, to the effect that plaintiff have judgment for the strip of land sought to be used for its right of way purposes, and that the defendant have and recover the amount of the award made by the jury as the value of the property actually taken, and the damage found by the jury to the remainder of the tract, aggregating the sum of $7,392.50, and that plaintiff pay all costs.

Plaintiff filed its motion for new trial, and

the defendant filed his motion to set aside the judgment entered on the verdict of April 3, 1911, and to enter judgment in favor of defendant on the findings of the jury, or, in the alternative, that a new trial be granted. These motions of plaintiff and defendant were overruled by the court, and both parties excepted thereto, and the plaintiff thereupon gave notice of appeal to the Court of Civil Appeals, and thereafter in due time perfected this appeal.

The defendant, Hornberger, also filed a motion in arrest of the judgment, in so far as same, following the verdict of the jury, condemned and awarded the right of way to plaintiff. The court, upon hearing this motion in arrest of judgment, and after having first overruled the motions of both parties for new trials, granted the motion of defendant in arrest of judgment, condemning the property, and thereupon the trial judge, upon his own motion, entered a decree to the effect that plaintiff take nothing by its suit to condemn, and that the defendant go hence, and recover all costs of plaintiff, and have his writ of possession for the strip of land sought to be condemned, and which had been taken and occupied, and was in the possession of plaintiff from the time of the original award by the commissioners, and the tender and deposit of the funds, according to law, as hereinbefore stated. To this action of the court in vacating the condemnation order, on motion of defendant to arrest judgment, and in entering such decree on his own motion, plaintiff duly excepted, and gave notice of appeal to the Court of Civil Appeals, and filed its supersedeas appeal bond in this connection.

The charter of the Houston Belt & Terminal Railway Company was attached to plaintiff's petition and made a part of it. So much of it as is material in the decision of this case is as follows:

"Know all men by these presents, that we [here follows the names and post office address of 10 persons] have associated themselves together under and by virtue of the general laws of the state of Texas, for the purpose of forming a terminal railway company, with all the rights, privileges and immunities granted to such companies by an act passed by the Twenty-Ninth Legislature of the State of Texas, and known as chapter 109 of the General Laws of 1905, and entitled, 'An act to amend section 53, article 642, chapter 2, title 21, of the Revised Statutes of the State of Texas,' and have organized themselves together, and have adopted the following charter, to wit: Article I. The name of this corporation shall be Houston Belt & Terminal Railway Company. Article II. This corporation is formed for the purpose of the construction, owning, maintenance and operation of a terminal railway company; and this corporation, in addition to the rights conferred by law upon corporations generally, shall have and exercise all the rights, powers and privileges conferred upon railroad companies by chapters 8 and 9 of title 94 of the Revised Statutes of the state of Texas relating to railroads, but this company shall have no right to charge any railroad company for terminal facilities beyond what may be prescribed by the Railroad Commission, and no one of its tracks shall exceed twenty (20) miles in length, and it shall issue no stocks or bonds, except such as authorized by the Railroad Commission of the state of Texas, under the provision of the stock and bond law of this state. The main line of railway of this corporation shall be constructed, commencing at a point near the northeastern part of the city of Houston, about four and one-third miles from the county courthouse; thence in a westerly, southerly, easterly and northerly direction in a circuitous route, so as to form a complete belt line or circuit around the principal part of the city of Houston to the point of beginning, and extending into, through and around the city of Houston and the suburbs thereof, in Harris county, Texas; the length of said main line being about twenty (20) miles."

Acting under this charter, and in accordance with the allegations of the plaintiff's petition, evidence was produced on the trial, showing substantially the following acts and course of conduct on the part of the plaintiff in the construction, maintenance, and operation of its tracks, yards, depots, and other terminal facilities:

Prior to the time of this suit, plaintiff had constructed and owned a track about 4.77 miles in length, to the north of the city of Houston, extending from a point of intersection with the Texas & Brazos Valley Railway on the northwest of Houston to a point on the Beaumont, Sour Lake & Western Railway, to the northeast of Houston, thus connecting these lines, and affording to each of them an entrance for their trains into the city of Houston by way of plaintiff's yards at Belt Junction, located to the north of Houston, at about the center of this connecting track. Extending southward from the yard at Belt Junction, plaintiff had a track running through the city of Houston on and across certain of its streets, passing by the locations of its freight and passenger depots, near the heart of the city of Houston; thence continuing in a southerly direction to a point about 2½ miles south of Houston, at which it terminated by intersecting with the main line of the Gulf, Colorado & Santa Fé Railway Company, and at which point it maintained a yard, with side tracks and switches, called the "south yard." Some of the track used by plaintiff between Belt Junction on the north and south yard to the south of Houston was leased by it from the Santa Fé Railway Company, but the mileage of railroad actually owned by it, which it controlled and operated between its yard at Belt Junction and its intersection with the Santa

Fé at south yard, was proximately 5.64 miles, so that, prior to and aside from the railroad now projected and involved in this case, and known as the East Belt Line, which is to be approximately 9.77 miles in length, plaintiff had and owned two tracks, one the line running east and west, terminating on the west at its intersection with the Texas & Brazos Valley Railway, and on the east at its intersection with the Beaumont, Sour Lake & Western Railway, with a length of 4.77 miles, and its line beginning at Belt Junction, about the middle of its other track, and extending approximately at right angles and southward to its connection with the Santa Fé Railway at the south yard, embracing a trackage constructed and owned by plaintiff of 5.64 miles.

The plaintiff has a contract with four railroad companies of Texas, operating trunk lines in and through the state from various points, and terminating at or passing through the vicinity of Houston, to wit, the Gulf, Colorado & Santa Fé Railway Company, the St. Louis, Brownsville & Mexico Railway Company, the Trinity & Brazos Valley Railway Company, and the Beaumont, Sour Lake & Western Railway Company, sometimes called the "Frisco," and these four railway companies own equally among them the capital stock of the plaintiff. Neither of these four companies has any adequate or sufficient terminal facilities at or in the vicinity of Houston for the purpose of handling, receiving, delivering and transferring freight and passenger traffic, and under this arrangement and contract plaintiff has undertaken to and is performing terminal service for each of the companies, and between and among them, both as to the receipt, delivery, and transfer of freight and passenger traffic, and also has established and is furnishing freight and passenger depot facilities for these four companies, and is negotiating with other railroad companies entering the city of Houston, especially the Missouri, Kansas & Texas Railway Company of Texas, for the purpose of furnishing passenger depot facilities. The charges made by plaintiff for freight terminal services are made according to the tariffs prepared and submitted to and approved by the Railroad Commission of Texas and the Interstate Commerce Commission. The practice of plaintiff has been and is to receive freight from any line, outside of the four mentioned, with which it has contracts, for delivery to any of those four lines, or to be placed on the siding at any factory or other industry located on the tracks of plaintiff, and the prices for serving and delivering to such roads and industries are listed and indicated on the tariff sheets placed in evidence, and which were approved by the Railroad Commission of Texas and Interstate Commerce Commission. But plaintiff, in its practice, declines to place on what are known as its "team tracks" car load shipments received from and shipped over railroads with which it has no contract for terminal facilities, and in this respect the rule and practice of plaintiff as to the use of its team tracks is the same as the practice of other railroad companies generally at the city of Houston, and such practice is recognized and approved as to all railroad companies by the Railroad Commission of Texas.

By reason of the great and increasing quantities of freight traffic being tendered to and handled by plaintiff at the Belt Junction and the south yard, and the transfer and delivery of same, and blocking of street crossings, and delay and congestion of business, it has become necessary, and is deemed advisable by plaintiff, and it has determined, to construct a new line of railroad, extending from an intersection with the Beaumont, Sour Lake & Western Railway on the northeast of Houston, to the south yard, in a southerly direction, for a distance approximately of 9.77 miles, and outside of the city of Houston, passing near the turning basin, and passing through the land of Hornberger involved in this case, with the view of more expeditiously and economically receiving and delivering, handling, and transferring freight traffic mutually between the four railroad companies mentioned, and others that plaintiff may be called upon or arrange to serve with terminal facilities, and thus to avoid the delay and public nuisance and extra expense involved in handling such traffic on the tracks through the streets of Houston, and thus to relieve the tracks passing through the city of the greater part of such freight traffic with which the same are now burdened, so that the track extending from Belt Junction in a southerly direction to the freight and passenger depots to the city of Houston may hereafter be more adequate for the purpose of the passenger service and other legitimate demands on plaintiff for service to the public in behalf of those railroad companies for which it shall afford terminal service.

While the evidence shows that considerable right of way has been acquired and is owned by plaintiff, extending westward from the Trinity & Brazos Valley Railway, north of Houston, around westward and southward into the vicinity of south yard, yet no track whatever has been constructed westward from the intersection of the Trinity & Brazos Valley Railway, so as to constitute any railroad track around Houston on the west side, or to the south yard from that direction.

J. J. Flynn, vice president and general manager of the appellant, testified that it was the intention of appellant not to serve any other freight lines than the four it is now serving. It was also shown by this witness and other witnesses that the appellant had refused to accept shipments coming into Houston over lines of railway, other

than the four it was then serving, except for some industries which had side tracks on appellant's lines. Certain witnesses stated that Flynn, in declining to receive such shipments, stated that the appellant was not a railroad company, not a common carrier, and not subject to the rules and regulations of the Railroad Commission. Flynn denied making these statements, but, for the purpose of this opinion it may be conceded that he did make them.

[1, 2] Appellant, by its first assignment of error, complains that the court erred in decreeing that plaintiff take nothing by its suit for condemnation of the strip of land involved and sought to be condemned for the purpose of its right of way, and that the defendant have a writ of possession for the strip of land, especially in so far as the decree is based on the court's holding that the plaintiff had no legal right to condemn, and that the act of the Legislature under which plaintiff was incorporated was unconstitutional and void, and insufficient to vest in plaintiff the power to condemn and take land for its right of way, etc.

By its first proposition under this assignment, appellant contends that the act of May 9, 1905 (General Laws of the Twenty-Ninth Legislature, page 211), under which plaintiff was incorporated, conferred the power of eminent domain through the express adoption of chapters 8 and 9, title 94, of the Revised Civil Statutes of Texas, as part thereof, and thus brought such corporation, when organized, within the self-enacting provision of article 10, §§ 1 and 2, of the state Constitution, making its railroad, when constructed, a public highway, and the company itself a common carrier, and hence subject, as such, to proper legislative restraint, through statutes then existing and applicable, *or to be enacted thereafter*, and, in the absence of such legislation, or pending its enactment, still, in any event, subject to the common-law doctrine against unjust discrimination and extortion by common carriers.

In disposing of the question raised by the assignment and proposition, a review of the legislation providing for the incorporation of terminal railroad companies becomes important. The first authority for the incorporation of such railway companies is found in article 642, Revised Statutes, wherein is provided the various purposes for which corporations may be formed; section 53 thereof being as follows: " (53) The construction, maintenance and operation of terminal railway companies, said companies to have no right to charge other railroads for terminal facilities beyond what may be prescribed by the Railroad Commission." This section was amended by the Legislature of 1905, and the amendment, omitting the caption and enacting clause, reads as follows: "Section 1. That section 53, of article 642, chapter 2, title 21, of the Revised Civil Statutes, be so

amended as to hereafter read as follows: Section 53. The construction, maintenance and operation of terminal railway companies, and said terminal companies, in addition to the rights conferred by law upon corporations generally, shall have and exercise all rights and powers conferred upon railroad companies by chapters 8 and 9 of title 94, of the Revised Statutes of Texas, relating to · railroads; but no such terminal company shall have the right to charge any railroad for terminal facilities, beyond what may be prescribed by the Railroad Commission, and no such terminal company shall have any one of its tracks more than twenty miles in length; providing that a corporation formed hereunder shall issue no stocks or bonds, except such as are authorized by the Railroad Commission under the provisions of the stock and bond law of this state."

Section 2 of the amendment is the emergency clause, and declares that "the fact that there is now no law conferring sufficient powers upon terminal railway companies to authorize them to acquire proper trackage to meet public demands creates an emergency," etc.

Section 53, amended as above, was again amended by the Legislature in 1907, and this amendment, omitting caption and enacting clause, is as follows: "Section 53. The construction, maintenance and operation of terminal railways, and any such terminal railway company, in addition to the rights conferred by law upon corporations generally, shall have and exercise all rights and powers conferred upon railroad companies by chapters 8 and 9 of title 94 of the Revised Statutes of Texas relating to railroads, including the right to issue bonds in excess of its authorized capital stock; provided, that its stock and bonds shall be issued under the direction of the Railroad Commission of this state in accordance with the stock and bond law regulating the issuance of stocks and bonds by railroads and the commission shall fix the value of the property, rights and franchises of such terminal railway company, and its stocks and bonds shall not exceed the amount authorized by the Railroad Commission of Texas; and jurisdiction over the issuance of the bonds herein authorized is hereby expressly vested in the Railroad Commission; provided, that no such terminal company shall have the right to charge any railroad company for terminal facilities a greater amount than may be from time to time designated and established by the Railroad Commission, which shall have authority to prescribe such rates and rules for the operation of all such terminal companies as will prevent discrimination by them against any common carrier with respect to either charges or services; provided, further, that the provisions of articles 4564, 4565 and 4566 of the Revised Statutes of Texas shall apply to. any and all orders, rulings, judgments and decrees of the Railroad Commission

made, entered or held under the provisions of this act in regard to such terminal railway companies."

This amendment also included an emergency clause couched in the same language as the emergency clause in the amendment of 1905.

The trial judge, in his conclusions of law, held, in effect, that the plaintiff's petition shows a sufficient public use of the land sought to be taken and sufficient necessity for its taking to warrant the exercise by it of the right of eminent domain, provided that it also shows that all railroads have the legal right to demand and enforce its service as to them, as well as to the four railroad companies that appellant was then serving. But he holds that as, under the amendment of 1905, no restrictions were placed upon terminal railway companies other than that they should not charge any railroad company for terminal facilities beyond what may be prescribed by the Railroad Commission, that no regulation had been prescribed by the Legislature to prevent unjust discrimination as to serving all railroads alike; hence no power in the Railroad Commission exists to compel appellant to furnish its services to all railroad companies without discrimination. He further held that the appellant's contention that the amendment of 1907 expressly placed appellant under the control of the Railroad Commission, with the power to prevent discrimination as to charges and service, was not applicable to, nor did it affect the rights of, plaintiff acquired by its charter under the amendment of 1905, for the reason, as stated by the trial judge, that "said act [Act of 1907] provides that corporations may be formed for the purpose of 'construction, etc.,' of terminal railways,' and throughout said act, in each provision thereof, the words 'terminal railways,' wherever mentioned, are preceded by the word 'such'; 'such terminal railways' clearly, to the court's mind, indicating terminal railways formed under the 1907 act, and not those which had already been organized."

Appellant contends that the construction the court places upon the language used in the amendment of 1907, confining the operation of the act to terminal companies thereafter to be organized under that act, and to have no relation to or effect upon companies theretofore organized under the act of 1905, is untenable, and contends that the amendment of 1907 has taken the place entirely of the original section 53 of article 642 and the amendment of 1905; and that the amendment of 1907, since its passage, became and continued the only law on the subject, and clearly embraces and covers, for purposes of regulation, the appellant, already chartered and in existence, and imposes upon it the additional regulations and restrictions which it was within the reserved and implied power of the state to adopt and apply. On the other hand, appellee contends, in effect, that the act of 1907 could not constitutionally impose on appellant the extra burden and restriction of being subject to control by the Railroad Commission against discrimination as to service rendered, for the reason that plaintiff, by its incorporation under the law of 1905 (through the silence of that law), has received a contract of immunity from such regulation and control by the commission, and that this additional control authorized by the amendment of 1907, imposing an additional burden on appellant, would impair the obligation of a contract. However, appellee seems to concede that, if the exactions and immunities imposed and granted by the amendment of 1907 affect or are binding on appellant, then it would be subject to control and regulation by the Railroad Commission as to charges and service, and, being subject to such regulations and control, could be compelled to serve all railroads, with whose tracks it connects, alike, and that in such case, discrimination not being allowed, the purpose for which the property was sought would be a public use, and might be acquired by the exercise of the right of eminent domain; for appellant's counsel, on page 105 of their able and exhaustive brief, says: "If it was conceded that appellant * * * is legally bound to serve the general public, and needed the property of appellee for this public use, then there would be in this case no controversy for this court to settle."

The original section 53 of article 642 did not confer, or attempt to confer, upon terminal companies the right of eminent domain. By the amendment of 1905, this power was attempted to be granted by expressly conferring upon such terminal companies all the rights and powers conferred upon railroad companies by chapters 8 and 9 of title 94 of the Revised Statutes. The Legislature, neither in the original section 53, nor in the amendments thereto, defined terminal railways, and we shall not undertake to do so; but that such companies are not to be regarded as railroad companies are generally regarded ✦ is obvious from the fact that their incorporation is provided for in the general incorporation act, and not in title 94, providing for the incorporation of railroad companies. Nothing in the original section discloses that terminal railways are of such character as to give them the right of eminent domain because of the public uses to which they are applied. The mere fact that the Legislature clothed them with such power would not confer upon them the right of its exercise, unless in fact their construction and operation is for a public use. Borden v. Irrigation Co., 98 Tex. 494, 86 S. W. 11, 107 Am. St. Rep. 640. It would serve no useful purpose to decide, and we shall not undertake to determine, whether the amendment of 1905, which gave to the Railroad Commission the power to prevent discrimination in charg-

es between the different railroads it might serve, without the power to prevent discrimination as to service or to compel it to serve alike all railroads with which its lines connected, made this a public use which justifies the power of eminent domain. That amendment was superseded by the amendment of 1907, which, in addition to giving the power to condemn and take private property for their proper uses by conferring upon them all the rights and burdens prescribed by chapters 8 and 9 of title 94, Revised Statutes of Texas, expressly placed them under the jurisdiction of the Railroad Commission, which body has the absolute right to prescribe rules and regulations to govern them in respect to charges and service; and the courts of the state are clothed with abundant power to enforce such rules and regulations when called upon to do so. Under this amendment, the appellant can be required by the commission to treat all lines of railway entering the city of Houston, and with which its lines connect, as to charges and service, alike, and prohibit and prevent discrimination in the regard mentioned in favor of the four railways it is now serving. In this view, it is wholly immaterial as to what its practice in this respect has been, or now is, or what the future intention of the corporation as to such matters may be.

This brings us to a discussion of appellee's contention that the incorporation of appellant, under the amendment of 1905, constituted a contract between the corporation and the state, which could not be impaired by the additional burdens imposed by subsequent legislation. We think this contention is without merit. There is nothing in the amendment of 1905, or in the appellant's charter, that expressly or by implication gives it immunity from additional burdens to be imposed, or prevent it accepting additional benefits to be conferred, by subsequent legislation. As held by the United States Supreme Court, in Pennsylvania Railroad Company v. Miller, 132 U. S. 75, 10 Sup. Ct. 34, 33 L. Ed. 267, "exemption from future general legislation, either by constitutional provision or by act of the Legislature, cannot be admitted to exist, unless it is expressly given, or unless it follows by an implication equally clear, with express words." In that case it is further held that: "The company took its original charter, subject to the general laws of the state, and to such changes as might be made in such general law, and subject to future constitutional provisions and future general legislation, since there was no prior contract with it exempting it from liability to such future general legislation in respect of the subject-matter involved." This holding is based on a long line of decisions in both the state and federal courts, and is peculiarly applicable to the question under discussion, in view of article 1, § 17, of the Constitution of this state, which provides that "no irrevocable or uncontrollable grant of special privilege or immunity shall be made, but all privileges and franchises granted by the Legislature, or created by its authority, shall be subject to the control thereof." We do not mean to be understood as holding that if the appellant, incorporated as it was under the amendment of 1905, was not a common carrier that the Legislature, by a subsequent amendment, could force that character upon it, and against its will compel it to assume burdens imposed upon common carriers generally; but when appellant seeks, as it does in this case, to avail itself of the right of eminent domain conferred by the amendment of 1907, it thereby assumes all the burdens and duties required of it by that act. Our conclusion therefore is that the amendment of 1907 governs appellant as to the rights and privileges it enjoys and the burdens it must discharge; and that under that act it is made a common carrier in the purview of article 10, §§ 1 and 2, of the state Constitution, and as such may exercise the right of eminent domain conferred by said amendment. It follows that the judgment of the court below, holding otherwise, must be reversed, and judgment be here rendered for appellant, sustaining such right.

In the view we take as to the proper disposition of this case, we conclude that the other assignments of error presented by appellant in its brief point out no errors which require a reversal of the judgment appealed from and the remanding of the case for another trial, and all such assignments are overruled.

We come now to the consideration of cross-assignments presented by appellee.

[3] By his first cross-assignment, appellee complains of the refusal of the court to enter judgment in his favor on the answers of the jury to the third, fourth, and fifth special issues submitted to them, wherein the jury found that at the time appellant appropriated appellee's land it intended to use it as a part of its contemplated main line, extending completely around the city of Houston substantially as described in its charter, and that the total length of the contemplated main line was 28.68 miles, and that the total distance of the contemplated line from its beginning point, as stated in its charter, measuring the longest way around to the first line of appellee's land, would be 21.40 miles. Appellee contends that as appellant's charter, and the amendment of 1905, under which it was incorporated, provide that no one of appellant's tracks should exceed 20 miles in length, and the jury having found, in effect, that appellee's land was desired by appellant for the purpose of building thereon its main line described in its charter, and that the main line was over 28 miles in length, and that from the beginning point of the main line, as described in the charter, following the course as described therein, it was more than

21 miles to the nearest line of appellee's land; that to permit appellee's land to be taken for right of way purposes would necessarily make appellant's main line more than 20 miles in length, contrary to the provisions of its charter and in direct violation thereof; and that therefore appellant had no right to condemn land for a right of way for one of its tracks that is over 20 miles in length.

The act of 1905, amending section 53 of article 642, Revised Statutes, under which appellant was incorporated, expressly provides that corporations created thereunder shall not have any one of its tracks more than 20 miles in length, and there is embraced in appellant's charter the same provision. It will be observed that in the amendment of 1907 this provision was eliminated; but, as appellant has not amended its charter in this regard, it is still limited, as to the length of any one of its tracks, by the terms thereof to 20 miles. We will pretermit any discussion here of the right of appellee, or any one other than the state, or some one under its authority, to raise the question under consideration.

Appellant's charter, in describing the main line to be built, uses this language: "The main line of railway of this corporation shall be constructed, commencing at a point near the northeastern part of the city of Houston, about four and one-third miles from the county courthouse; thence in a westerly, southerly, easterly and northerly direction, in a circuitous route, so as to form a complete belt line or circuit around the principal part of the city of Houston to the point of beginning, and extending into, through and around the city of Houston and the suburbs thereof, in Harris county, Texas; the length of said main line being about twenty (20) miles."

It was shown by the evidence that appellant had acquired a right of way from the beginning point, designated in its charter, and running the courses therein named to appellee's land, but that its railroad had been built only on a portion thereof; and that if the railroad had been built on all this right of way it would be more than 20 miles in length before reaching appellee's land. But the testimony shows that, instead of building its railroad from the starting point on the course called for in the charter, the appellant had begun to build its road, as it had the right to do, in the reverse direction from the calls in the charter; that is, instead of going in a westerly direction, it had begun to build in a southerly direction, which would be the reverse of the last call named in the charter, and, by running in this direction, the combined length of its main line on reaching and passing through appellee's land would be less than 20 miles. There is nothing in the charter to require appellant to build its railroad on the right of way which it had acquired, and no reason shown why, after passing through appellee's land, it could not, by reducing the circumference of the circuit, keep within the 20 miles provided in the charter. To appellee's contention, then, it is a sufficient answer that appellant, after it has constructed its railroad through the land of appellee, will have no one of its tracks more than 20 miles long. What it may do or attempt to do after it has acquired the 20 miles of track, with reference to extending its line further, is a matter that may be determined when that question properly arises. The assignment is overruled.

[4] Appellee, by his third cross-assignment, complains that the court erred to his prejudice in overruling his general demurrer and special exception No. 1, which challenge the sufficiency of plaintiff's petition, in that it is claimed that it appeared from the allegations of the petition and the charter attached thereto as an exhibit that plaintiff is incorporated and undertaking to conduct two separate and distinct businesses, each of which is provided for by separate subdivisions of article 642, Revised Statutes; one of such businesses being to construct and operate a suburban belt line railway, provided for by subdivision 21 of article 642; the other being to construct and operate a terminal railway provided for by subdivision 53 of said article. Appellee, by said special exception, challenged the right of appellant to condemn property under a charter issued to it for two such alleged purposes, and claimed that appellant was not duly incorporated, and could not legally exercise the power of eminent domain under such charter.

We think the language of the charter itself a sufficient answer to the assignment. The purpose for which the corporation was formed is therein stated to be "the construction, owning, maintenance and operation of a terminal company." In the preamble, it is recited that the parties named as incorporators have associated themselves together "for the purpose of forming a terminal railway company, with all the rights, privileges and immunities granted to such companies by an act passed by the Twenty-Ninth Legislature of the state of Texas and known as chapter 109 of the General Laws of 1905, and entitled 'An act to amend section 53, article 642, chapter 2, title 21, of the Revised Statutes of the state of Texas.'" There is in the charter no reference to section 21 of article 642, providing for the incorporation of suburban or belt line railways, and the language used is susceptible of no other construction than the incorporation of appellant under and by virtue of section 53 of said article 642, as amended in 1905. The fact that the corporation adopted for its name "Houston *Belt* & Terminal Railway Company," and that the second paragraph of its charter provided that it should run in such a circuitous route as "to form a complete belt line or circuit around the

principal part of the city of Houston," is not inconsistent with or a contradiction of the plain declaration that the purpose was to form a terminal railway company under the 1905 amendment to section 53. The assignment is overruled.

We have concluded that appellee's second and fourth cross-assignments are without merit, and are overruled without further comment.

Having reached the conclusion that the trial court erred in holding that appellant had not the power of eminent domain, and that its judgment in this regard must be reversed 'and judgment here rendered for appellant, sustaining that right, and having concluded that the cross-assignments presented by appellee cannot be sustained, we must now decide what judgment this court should enter upon the facts; the whole case now being before us.

As will be observed from our statement of the nature and result of the suit in the first part of this opinion, at the close of the trial, the jury found on special issues that the value of the land of appellee sought to be taken by appellant, and the damage to the remainder of the tract, aggregated $7,392.50, whereupon the court, on special findings of the jury, entered judgment in favor of appellant for the land, and in favor of the appellee for said sum as his damages. Appellant filed its motion and amended motion for a new trial on this branch of the case, which were overruled, and it then gave notice of appeal and filed its supersedeas appeal bond, thereby perfecting its appeal from said judgment to this court. Appellee filed a motion in arrest of the judgment, in so far as same, following the verdict of the jury, condemned and awarded the right of way to appellant, which, after the motion for new trial of both parties had been overruled, was sustained by the court, and thereupon the court, on its own motion, entered a decree, to the effect that appellant take nothing by its suit to condemn, and that the appellee go hence, and recover his costs, etc. This last decree was also appealed ·from by the appellant herein.

The verdict of the jury, finding the amount and awarding damages to appellee for the value of the land taken, was not set aside or vacated, and stands to-day. Appellant does not complain that the amount of the award is excessive, or, if it does, we find that the amount awarded was authorized by the evidence, The record in this case being complete, this court can here enter such judgment as should have been rendered by the court below. Templeman v. Gibbs, 25 S. W. 737. It is therefore the opinion of this court that the judgment entered on April 3, 1911, on the special verdict and findings of the jury, to the effect that appellant, Houston Belt & Terminal Railway

Company, have judgment for the strip of land sought to be used by it for right of way purposes, and that the defendant, Hornberger, have and recover the amount of the award made by the jury for the value of the property actually taken, and the damage found by the jury to the remainder of appellee's land, aggregating the sum of $7,392.-50, with 6 per cent. per annum interest thereon from the date of said judgment, be reinstated, and it has so been ordered; and the judgment, as so reinstated, is approved and in all things affirmed.

Affirmed.

### On Motion for Rehearing.

We stated in our opinion that "appellant does not complain that the amount of the award is excessive, or, if it does, we find that the amount of the award was authorized by the evidence." We withdraw so much of that statement which says that appellant does not complain that the amount of the award is excessive, but adhere to the conclusion there reached that the amount was warranted by the evidence.

We have carefully examined the motion for rehearing filed by the appellant, as well as that filed by the appellee, and have concluded that both should be overruled, and it has been so ordered.